J-A08034-23

2023 PA Super 83

| | | |
|---|---|---|
| T. LEE ROUSE | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| KIMBERLY ROSENBERG AND | : | No. 828 WDA 2022 |
| HOWARD ROSENBERG, HER | : | |
| HUSBAND AND MARTHA LAUX | : | |

Appeal from the Order Entered July 11, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-21-014912

BEFORE: STABILE, J., SULLIVAN, J., and PELLEGRINI, J.[*]

OPINION BY PELLEGRINI, J.:                **FILED: May 15, 2023**

This case involves a cause of action for emotional distress resulting from interference with a dead body. Under § 868 of the First Restatement of Torts, as adopted by our Supreme Court in **Papieves v. Lawrence**, 263 A.3d 118, 120 (Pa. 1970), "one who wantonly mistreats or, acting without privilege, intentionally withholds the body of a decedent is liable in tort to the member of the decedent's family who is entitled to the disposition of the body." The issue here is whether a person "intentionally withholds" a missing murder victim's body where they allegedly acted as accessories after the fact but are not alleged to have helped hide the body or even know its location.

---

[*] Retired Senior Judge assigned to the Superior Court.

The plaintiff, T. Lee Rouse (Rouse), sued Kimberly and Howard Rosenberg (the Rosenbergs), and Martha Laux (Laux) (collectively, Defendants). The Rosenbergs' son murdered Rouse's son and hid his body in a park where it remained undiscovered for over two months. During that time, the Rosenbergs came into possession of the handgun that their son used to commit the murder. Rather than take it to the police, the Rosenbergs took it to their marriage counselor, Laux. She then took the handgun to the police but lied about how she found it. Based on all this, Rouse alleged that Defendants delayed the proper disposition of her son's body. Defendants countered that they could not be held liable for interference with a dead body because there was no allegation that they ever touched or controlled her son's body, let alone even knew its location. Agreeing with Defendants, the Court of Common Pleas of Allegheny County (trial court) dismissed Rouse's action on preliminary objections.

On appeal, Rouse argues that she pleaded sufficient facts to withstand demurrer because (1) this case is analogous to **Papieves**, and (2) she was not required to show that Defendants ever physically touched or hid her son's body. After review, we affirm.

## I.

As discussed, this case arises from the tragic murder of Rouse's son, Christian Moore-Rouse (Christian), who was killed by the Rosenbergs' son, Adam Rosenberg (Adam). As alleged in Rouse's complaint, the facts of which

- 2 -

we take as true,[1] Christian and Adam attended community college together and became friends. The Rosenbergs knew that their son was friends with Christian because he would often visit Adam at their home, which is where he lived. In fact, Kimberly Rosenberg would sometimes drive her son to Christian's home or let him use the Rosenbergs' credit card to pay for rides for Christian to come to the house.

In the spring of 2019, Adam began showing signs of severe mental illness, eventually escalating into violence. Because of his behavior, the Rosenbergs had Adam involuntarily committed five times by the end of the summer. Then, in October 2019, he overdosed on heroin and was in a coma for a week, then inpatient treatment for three weeks. After Adam returned home to live with his parents, Christian was the only person who would come visit him, as Kimberly Rosenberg would also still drive Adam to visit Christian.

On December 21, 2019, Adam invited Christian to his parents' home and paid for his ride. After Christian arrived, Adam shot him in the back of the head with a .9 mm handgun. Adam then dragged Christian's body across the roadway in front of his parents' house and left it in a wooded public park.

_____

[1] Since we are reviewing rulings on preliminary objections in the nature of demurrers, we take as true all material facts pled in the complaint, and any reasonable inferences deduced therefrom. *See Commonwealth v. Chesapeake Energy Corp.*, 247 A.3d 934, 936 n.1 (Pa. 2021) (citation omitted).

A few days later, Christian's family reported him missing. Within two weeks, homicide detectives were assigned to investigate his disappearance.

In the weeks after the murder, the Rosenbergs somehow came into possession of the handgun that Adam used to kill Christian. As alleged by Rouse, either (1) Adam told his parents what he had done and gave them the handgun, or (2) the Rosenbergs found the handgun in their residence and knew that it was likely evidence of a crime committed by their son.

In any event, after obtaining the handgun, the Rosenbergs took it to Laux and transferred possession of it over to her to prevent or delay Adam's arrest. According to Rouse, the Rosenbergs told Laux about their son's severe mental illness and drug problems, as well as their knowledge or belief that Adam was involved in Christian's disappearance. After being told this, on January 20, 2020, Laux took the handgun to the police. When asked how she came into possession of the handgun, Laux lied and told the police that she had found it while walking her dog in a park. Sadly, it would be over a month until Christian's body was found on March 3, 2020.

On December 14, 2021, Rouse sued Defendants,[2] alleging that their actions delayed the police investigation and eventual discovery of her son's body. As a result, Rouse averred, she was prevented from making proper

_____

[2] Rouse also sued a company that she believed was Laux's employer but later dropped them from the suit.

disposition of her son's body and suffered severe emotional distress. Defendants filed preliminary objections in the nature of a demurrer, construing Rouse's complaint as attempting to raise claims of intentional and negligent infliction of emotional distress. Rouse responded by clarifying that she was seeking recovery for the tort of negligent interference with dead bodies under § 868 of the Second Restatement of Torts. However, because no Pennsylvania court has recognized that cause of action, she argued in the alternative that her cause of action was for wanton or intentional interference with dead bodies under **Papieves**, which, as noted, adopted the definition of the tort under § 868 of the First Restatement of Torts:

> A person who wantonly mistreats the body of a dead person or who without privilege intentionally removes, withholds or operates upon the dead body is liable to the member of the family of such person who is entitled to the disposition of the body.

RESTATEMENT (FIRST) OF TORTS, § 868 (1939).

In **Papieves**, the defendant struck a 14-year-old boy with his car and, rather than getting medical help, hid the boy's body in his garage for a few days before enlisting a friend to help bury the body in a nearby field. After the body was found, the boy's parents brought a claim against the defendant and his friend seeking to recover for the "mental anguish, emotional disturbance, embarrassment, and humiliation" they had suffered. On appeal from dismissal of the action, the Pennsylvania Supreme Court reversed, concluding that "recovery may be had for serious mental or emotional distress

- 5 -

directly caused by the intentional and wanton acts of mishandling a decedent's body." **Papieves**, 263 A.3d at 121.

As construed by Rouse, **Papieves** held that a family member can recover for emotional distress where a killer intentionally hides the victim's body and others assist, thus preventing proper disposition. Like the parents in **Papieves**, Rouse asserted, she was suing the persons who acted as accessories after the fact in withholding the location of her son's body.

In response to Rouse's clarification, Defendants noted that Pennsylvania courts have declined to adopt § 868 of the Second Restatement of Torts. As for intentional interference under **Papieves**, Defendants asserted that § 868 of the First Restatement of Torts, by its plain language, requires that a person wantonly mistreat or intentionally remove, withhold or operate a dead body. Thus, Defendants argued, a person could not be liable unless that person had some kind of physical contact or control over the decedent's body, which Rouse was not alleging.

The trial court agreed and sustained the preliminary objections with leave for Rouse to amend her complaint. After she declined to do so, Defendants moved to dismiss for failure to file an amended complaint. On July 11, 2022, the trial court dismissed the complaint with prejudice. Rouse timely appealed and now raises these two issues:

> 1. Did the lower court err as a matter of law by sustaining preliminary objections in the nature of a demurrer to a Complaint in Civil Action averring facts that support a cognizable claim under the Restatement (First) of Torts, Section 868, Interference with

Dead Bodies, which establishes the principle of liability for emotional distress damages caused to the member of the family of a deceased person who is entitled to the disposition of the body against any person who, without privilege, intentionally or wantonly withholds the dead body?

2. Did the lower court err as a matter of law by sustaining preliminary objections in the nature of a demurrer to a Complaint in Civil Action averring facts that support a cognizable claim under the Restatement (Second) of Torts, Section 868, Interference with Dead Bodies, which establishes the principle of liability for emotional distress damages to a member of the family of a deceased person who is entitled to the disposition of the body against any person who intentionally, recklessly or negligently withholds the body of the dead person or prevents its proper interment or cremation?

Rouse's Brief at 3.[3]

## II.

As noted in our introduction, Rouse makes two arguments for why her claim of interference with a dead body should have withstood demurrer. First, she contends that the facts here are "on all fours" with those in **Papieves**.

_____

[3] As noted, the law governing preliminary objections is well-settled:

Preliminary objections in the nature of a demurrer should be granted where the contested pleading is legally insufficient. Preliminary objections in the nature of a demurrer require the court to resolve the issues solely on the basis of the pleadings; no testimony or other evidence outside of the complaint may be considered to dispose of the legal issues presented by the demurrer. All material facts set forth in the pleading and all inferences reasonably deducible therefrom must be admitted as true.

**Caltagirone v. Cephalon, Inc.**, 190 A.3d 596, 599 (Pa. Super. 2018) (citations omitted). Our standard of review is _de novo_. **Id.**

Second, she asserts that there is no "hands on" requirement for interference with a dead body, that is, a person does not need to physically touch the decedent's body to be liable for the tort. For support of this contention, she cites our opinion in *Weiley v. Albert Einstein Med. Ctr.*, 51 A.3d 202 (Pa. Super. 2012). After review, we find neither *Papieves* nor *Weiley* supports the novel claim that she is attempting to raise.

**A.**

In *Papieves*, the Supreme Court gave the following summary of the underlying facts:

> … Richard Papieves, the fourteen year old son of Joseph V. and Margaret Papieves (plaintiffs-appellants herein), disappeared from his home on June 11, 1965. It was subsequently discovered that on that day Papieves by had been struck by a motor vehicle operated by a minor, one Owen Norman Lawrence (defendant herein). Whether Papieves was killed or seriously injured in the collision is not of record. Without attempting to obtain medical assistance and without notifying either the [] or the boy's parents, Lawrence removed Papieve's body from the scene of the accident, took it to his home, and hid it in his garage. Some few days later, Lawrence contacted one Joseph J. Kelly, also a minor, and requested his assistance in disposing of the body of Papieves. Defendant Lawrence and Kelly thereupon took Papieves' body to a field near Darby Creek Road in Marple Township, Delaware County, where they dug a grave and interred the decedent. More than two months later, the partially decomposed body of young Papieves was found, and his remains were returned to his parents.

> Thereafter, plaintiffs commenced this suit by filing and having served a complaint in trespass against Lawrence and Kelly, alleging that defendants' acts constituted an invasion of, and an unlawful interference with, plaintiffs' right to the possession of the decedent's body; that such acts constituted an unlawful and indecent disposal of decedent's body without the authority or consent of the plaintiffs; and that defendants had so acted with the intent to prevent the plaintiffs from discovering the fate of

their son. Plaintiffs averred that as the result of the aforesaid acts they had suffered mental anguish, emotional disturbance, embarrassment, and humiliation; they sought damages in excess of $10,000 against both defendants.

Defendant Kelly filed preliminary objections in the nature of a demurrer and a motion for more specific pleadings. [The trial] court sustained Kelly's demurrer and dismissed the complaint. This appeal followed.

*Papieves*, *supra* at 119.

On appeal, while noting that no Pennsylvania court had yet allowed recover for emotional distress "resulting from the mishandling of the body of a deceased relative," the Court observed that other jurisdictions have "recognized claims for mental suffering caused by the defendant's wanton or intentional mishandling of the body of the decedent," including "the unlawful interment or disinterment of a body, intentional interference with a burial, the wanton mutilation or unauthorized embalming of a corpse, and other intentional, reckless or wanton acts likely to cause severe emotional distress." *Id*. at 120 (collecting cases). While some of these jurisdictions emphasized the next-of-kin's property rights in the decedent's body, the Court found that "the real[]issue is the right of a decedent's nearest relatives to protection against intentional, outrageous or wanton conduct which is peculiarly calculated to cause them serious mental or emotional distress." *Id*. at 121.

While thus recognizing that "any extension of legal liability to acts which cause emotional distress is not without its problems," the *Papieves* Court

concluded that the parents of the deceased boy could continue with their cause of action.

> …There can be little doubt that mental or emotional disorders brought on by conduct such as that set forth in the complaint at bar may be every bit as real, every bit as debilitating as ailments which have more obviously physical causes. For this reason, the obvious and inherent difficulties of the proof, or disproof, of emotional distress and the measurement of damages for such injury are not adequate cause, standing alone, to deny recovery. **We conclude that recovery may be had for serious mental or emotional distress directly caused by the intentional and wanton acts of mishandling a decedent's body which are here alleged**.

*Id*. at 121 (emphasis added).

First, as a factual matter, we cannot agree with Rouse that, like the parents in ***Papieves***, she is also suing "the persons who acted as accessories after the fact in order to continue the body's withholding for a period of over two months." Rouse's Brief at 15. Under this argument, Rouse analogizes Defendants with the defendant Kelly in ***Papieves*** who had nothing to do with decedent's death but helped hide his body by digging a grave and burying the decedent. Here, in contrast, there is no allegation that Defendants helped Adam hide Christian's body in the wooded public park near the Rosenbergs' residence. In fact, there is no allegation that Defendants ever even learned the location of Christian's body. Thus, we find Rouse's attempt to analogize this case to ***Papieves*** unavailing.

Rouse also argues that ***Papieves*** "establishes that where a killer hides his victim's body and others subsequently assist in the ongoing concealment,

that interference with a dead body causing emotional distress to the family member entitled to disposition of the body is a viable § 868 cause of action against not only the original perpetrator, but also against his after the fact accessories." *Id*.[4]

There are two things wrong with this argument—one factual and one legal. Factually, even if we accepted Rouse's interpretation of *Papieves*— which we do not—her complaint does not allege that Defendants assisted in the ongoing concealment of the missing victim's body. Again, there are no allegations that Defendants helped hide, move or cover up Christian's body. At most, Rouse's complaint alleges that the Rosenbergs somehow came into possession of the murder weapon and either knew or suspected that Adam was responsible for Christian's disappearance, and that they used their marriage counselor to turn the murder weapon into the police under a false explanation. While these facts might not paint Defendants in a positive light, those facts also do not show that they did anything to conceal the location of a murder victim's body or thwart the police from discovering it, let alone even know where it was located.

---

[4] "Accessory" is defined as "[s]omeone who aids or contributes in the commission or concealment of a crime," while the sub-definition "accessory after the fact" is defined as "[a]n accessory who was not at the scene of the crime but knows that a crime has been committed and who helps the offender try to escape arrest or punishment." ACCESSORY, Black's Law Dictionary (11th ed. 2019).

That brings us to the second problem with Rouse's argument on **Papieves**:  § 868 of the First Restatement of Torts, by its plain language, does not apply to Defendants' alleged conduct.  As noted, § 868 allows recovery against a person who "wantonly mistreats" the decedent's body or, without privilege, "intentionally removes, withholds or operates upon" the dead body.  Accordingly, as we recognized in **Weiley**,

> [a] plain reading of section 868 reveals that a party can plead that the defendant acted with a wanton state of mind in the mistreatment of a body, as per the first portion of section 868, or that **the defendant acted intentionally, without privilege, to remove, withhold or operate on the dead body**, as per the second portion of section 868, or that the defendant acted with both states of mind.

**Weiley**, **supra** at 209 (footnote omitted) (emphasis added).

Our focus here is on the second portion, since Rouse's theory of her cause of action under § 868 is that the Defendants acted to intentionally "withhold" her son's dead body.  First, for a person to "withhold" something— in this case, a dead body—would require that the person have possession, control, authority or, at the very least, know about the dead body's existence or location.  Indeed, the verb "withhold" is defined as:  "to hold back from action," "to keep in custody," or "to refrain from granting, giving, or allowing." Merriam-Webster' Collegiate Dictionary 1439 (11th ed. 2014).  Applying these definitions to this case, Defendants could not hold back, keep in custody or refrain from granting or giving Christian's body because there is no allegation that they possessed it or controlled it.

We also note that under the second portion of § 868, "withhold" is grouped with "remove" and "operate" as the forms of proscribed intentional conduct. Reading these terms together as we would any statute,[5] we ascribe a meaning to "withhold" a dead body as we would ascribe to "remove" or "operate on" a dead body. For a defendant to "remove" a dead body, that

---

[5] "The ancient maxim 'noscitur a sociis' summarizes the rule that the meaning of words may be indicated or controlled by those words with which they are associated. Words are known by the company they keep." **Northway Vill. No. 3, Inc. v. Northway Properties, Inc.**, 244 A.2d 47, 50 (Pa. 1968). The principle of noscitur a sociis is applied to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of the [General Assembly]." **Gustafson v. Alloyd Co.**, 513 U.S. 561, 575 (1995) (citations and quotations omitted). Pursuant to this rule, "the meaning of a doubtful word may be ascertained by reference to the meaning of words associated with it." **Ford Motor Co. v. Unemployment Comp. Bd. of Review**, 79 A.2d 121, 123 (Pa. Super. 1951) (footnote omitted).

A related concept is that of ejusdem generis. "Under ... [the] doctrine *ejusdem generis* ('of the same kind or class'), where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated." **McClellan v. Health Maint. Org. of Pa.**, 686 A.2d 801, 806 (Pa. 1996) (citations omitted). Stated in somewhat repetitive yet different language, the rule of ejusdem generis instructs that "where general words follow an enumeration of ... words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to ... the same general kind or class as those specifically mentioned." **Steele v. Statesman Ins. Co.**, 607 A.2d 742, 743 (Pa. 1992) (citations omitted). This maxim is codified conceptually in Section 1903(b) of the Statutory Construction Act, which provides, "General words shall be construed to take their meanings and be restricted by preceding particular words." 1 Pa.C.S. § 1903(b). **See generally S.A. by H.O. v. Pittsburgh Pub. Sch. Dist.**, 160 A.3d 940, 945–46 (Pa. Cmwlth. 2017).

defendant would need to physically touch it or, at the very least, have some kind of custody or authority over the dead body. The same holds true if a defendant were to "operate on" a dead body, as the defendant would need to physically touch the dead body in some fashion. Consistent with these words, we read "withhold" in § 868 as requiring that the person possess, control or have some kind of dealing with the body in the same way they would need to have if the person were to "remove" or "operate on" a dead body.

That this is the proper reading of § 868 is supported by the comment that the drafters of the First Restatement of Torts provided in 1939.

> a. A member of the family [citation] of a deceased person who is entitled to the disposition of the body has an action of tort against one who wantonly maltreats or **improperly deals with the body** of such person. This right exists although there has been no harm except such harm to the feelings as is inseparable from the knowledge of the defendant's conduct. The right to maintain an action for intentional interference with the body exists although there was no intent to do a tortious act, as where a body is misdelivered by the railroad or where a surgeon performs an autopsy mistakenly believing that he is privileged to do so. …
>
> b. The cause of action is primarily for mental suffering caused by the **improper dealing with the body**. …

RESTATEMENT (FIRST) OF TORTS, § 868 cmt. a-b (emphasis added).

In **Papieves**, likewise, our Supreme Court used the same language in recognizing the tort. Indeed, in adopting § 868 to allow recovery under the facts of the case, the **Papieves** Court clarified that "recovery may be had for serious mental or emotional distress directly caused by the intentional and wanton acts of **mishandling a decedent's body**." **Papieves**, 263 A.2d at

121 (emphasis added). On this point, we note that Rouse has not pointed us to any cases after ***Papieves*** interpreting its holding in the way she proposes, namely, that § 868 creates a cause of action for a family member of a missing person against any person who acts as an accessory after the fact in some fashion, regardless of whether that person took any action concerning the missing person's body.

Thus, to recap, we read neither § 868 nor ***Papieves*** as allowing for recovery in the circumstances involved here where a murder victim is missing and the defendant allegedly acts as an accessory after the fact in some manner, regardless of whether the defendant knew the dead body's location. Again, the focus of § 868, as adopted in ***Papieves***, is on the mishandling of the dead body that causes the family member's emotional distress. Unless there is an allegation that the defendant "wantonly mistreats" the dead body or intentionally removes, withholds or operates on it, then there can be no liability under § 868 or ***Papieves***.

**B.**

Next, Rouse argues that there is no "hands on" requirement under § 868, that is, she was not required to plead that Defendants physically touched or moved Christian's body. As noted, for support, she cites this Court's decision ***Weiley*** for the proposition that there is no such requirement for recovery under § 868 or ***Papieves***. After review, however, we find that ***Weiley*** does not support her argument.

In **Weiley**, without the consent of the plaintiff son, the defendant hospital sent the deceased body of the plaintiff's father, via a funeral home, to a medical school for holding. After several days of contacting the school to find his father's body, the son went to the medical school to retrieve his father's body for cremation and discovered that post-mortem procedures had been performed on his father's body. As result, the son sued the hospital for, among other causes of action, tortious interference with a dead body.

On appeal from dismissal of the cause of action, this Court reversed the trial court's holding that the plaintiff son failed to state a cause of action against the hospital because he failed to allege that the hospital, in transferring his father's body for medical dissection, specifically intended to cause him to have serious mental distress. **See Weiley**, **supra** at 210. Turning to what level of intent was required under **Papieves**, we concluded that the **Papieves** Court applied a definition of "intent" that matched that given in the Second Restatement of Torts.

> References in **Papieves** to conduct that is "likely to cause" or has a high probability of causing serious mental distress comports with the definition of "intent" found in the Restatement (Second) of Torts: "The word 'intent' is used throughout the Restatement of this Subject to denote that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it." RESTATEMENT (SECOND) OF TORTS § 8A (1965). In **Burr v. Adam Eidemiller, Inc.,** 386 Pa. 416, 126 A.2d 403, 407 (1956), our Supreme Court applied this definition of intent to conclude that the defendant tortfeasor intentionally polluted the plaintiff's land because it knew its operations were the cause of the pollution, yet continued its operations unabated despite this knowledge. This is the same definition applied in **Papieves**. Thus, we conclude that this

- 16 -

definition of intent, for the purpose of the second portion of section 868, is met by showing either a desire to cause mental distress or a belief or knowledge that one's conduct is substantially certain to cause the plaintiff mental distress, as where "the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead" with the conduct anyway. RESTATEMENT (SECOND) OF TORTS § 8A cmt. b.

**Weiley**, **supra** at 211.

Applying the correct definition of intent to the cause of action against the hospital, we found that plaintiff son pleaded sufficient facts to establish that the defendant hospital intentionally interfered with his father's dead body. In so concluding, we have the following summary for why his claim withstood demurrer:

> … Weiley was the family member entitled to disposition of the body. This privilege or authority was not transferred to Hospital. Hospital knew that Weiley did not want organ donation or dissection. Yet, without trying to contact Weiley or otherwise obtain consent, it transferred and/or donated the body to School despite this knowledge. School accepted the body as an anatomical donation whereupon it was dissected. Hospital's unauthorized conduct caused this result, and, given Hospital's knowledge of Weiley's contrary wishes and Weiley's distraught feelings and involvement as expressed throughout the time of his father's treatment, a factfinder could conclude that Hospital was substantially certain that Weiley would suffer serious emotional distress, sufficient for the "intentional" portion of section 868.

**Id**. at 213.[6]

---

[6] We also concluded that the plaintiff son pleaded sufficient facts under a "wanton mistreatment" theory of the cause of action. **See Weiley, supra** at 213-14.

Rouse reads *Weiley* as establishing that there is no "hands on" requirement for a claim of interference with a dead body under § 868 because, in *Weiley*, the defendant hospital that transported the father's body to the medical school for dissection "never touched the body."  Rouse's Brief at 19.  However, as our review shows, the main issue in *Weiley* was what definition of "intent" should apply to § 868 under *Papieves*.  Whether § 868 requires that the defendant physically touch or control the decedent's dead body was not an issue in the case; instead, the issue was whether the defendant hospital acted with sufficient intent.  In any event, even if we accepted Rouse's strained reading of *Weiley*, her argument would still not work because the defendant hospital had possession of and controlled the decedent's body unlike the Defendants here, who are not alleged to have even known the location of Christian's body.  Thus, we find Rouse's reliance on *Weiley* misplaced.  Accordingly, for all these reasons, we conclude that Rouse failed to plead sufficient facts for a cause of action for interference with a dead body under *Papieves* and § 868 of the First Restatement of Torts.

**III.**

In her second issue, Rouse requests that we expand the tort of interference with dead bodies to include negligent conduct under § 868 of the Second Restatement of Torts.[7]  She also recognizes, however, that in *Hackett*

---

[7] Under § 868 of the Second Restatement of Torts:

***v. United Airlines***, 528 A.2d 971 (Pa. Super. 1987), this Court was faced with the same request and declined to adopt § 868 under the Second Restatement of Torts. As we explained in ***Weiley***:

> In ***Hackett***, the plaintiff asserted a negligence claim to recover for emotional damages caused by the defendant's careless preparation of the plaintiff's mother's body and its mishandling of the casket during shipment from Pennsylvania to California, which resulted in damage to both the casket and the body. ***Hackett***, 528 A.2d at 972. The Court recognized that the Restatement (Second) of Torts contained a revised and expanded section 868 to include negligent conduct. ***Id.*** at 973. However, the ***Hackett*** court stated that our Supreme Court had not considered or adopted the revised Restatement provision and concluded that "any extension of the ***Papieves*** rule of recovery to include actions for negligent infliction of emotional distress must come from the Supreme Court itself, through express adoption of the 1977 Restatement (Second) revision of Section 868." ***Id.*** at 974.10.
>
> Pennsylvania has not yet adopted the revised version of section 868 to include negligent interference with a body, and we are currently restricted to the ***Papieves*** Court's limitation of this tort to wanton or intentional conduct in accordance with the First Restatement of Torts section 868.

***Weiley***, ***supra*** at 214.

Because we are bound by our existing precedent, we will not expand the tort of interference with dead bodies to include the definition under the Second

---

> One who intentionally, recklessly or negligently removes, withholds, mutilates or operates upon the body of a dead person or prevents its proper interment or cremation is subject to liability to a member of the family of the deceased who is entitled to the disposition of the body.

RESTATEMENT (SECOND) OF TORTS § 868 (1977).

Restatement of Torts.  If Rouse seeks such an expansion, it will need to come from our Supreme Court.

Order affirmed.

Judge Stabile joins the opinion.

Judge Sullivan concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:   5/15/2023